Peconic Land Trust, Inc. v Salvatore (2025 NY Slip Op 51322(U))

[*1]

Peconic Land Trust, Inc. v Salvatore

2025 NY Slip Op 51322(U)

Decided on August 22, 2025

Supreme Court, Suffolk County

Pastoressa, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on August 22, 2025
Supreme Court, Suffolk County

Peconic Land Trust, Incorporated, Plaintiff(s),

against
Max Salvatore, individually and as Trustee of the Maximilian Salvatore 2010 Living Trust, THOMAS SALVATORE, as Trustee of the Diane Salvatore 2010 Living Trust, 
 FRANK SALVATORE, as Trustee of the Diane Salvatore 2010 Living Trust, 
 DIMAX REALTY LP, and THOMAS SALVATORE, individually, Defendant(s).

Index No. 612373/2016

Benowich Law, LLP, White Plains, NY, and Gerald V. Dandeneau P.C., Melville, NY, for plaintiff
Defendants are all pro se

Joseph C. Pastoressa, J.

In a prior decision of this Court recently affirmed by the Appellate Division (Peconic Land Trust, Inc. v Salvatore, 238 AD3d 1168), the plaintiff was awarded summary judgment declaring that the defendants violated certain provisions of a conservation easement and enforcing the conservation easement by compelling the restoration of the property to the condition that existed prior to such violations. A bench trial was held by this Court on damages including, inter alia, a determination of the cost to restore the subject property. 
On the basis of the credible evidence adduced at trial including all witnesses and exhibits, the Court makes the following findings of fact and conclusions of law:
The damages trial in this case presented the proverbial and quite common "battle of the experts" where plaintiff's and defendants' experts reached diametrically-opposed conclusions. Courts in such circumstances are tasked with assessing the credibility of the respective expert witnesses, as well as the stated bases for their opinions, and then, determining which expert's opinions are more strongly supported by the evidence presented and flow more reasonably and logically given the experts' respective explanations of the relevant science or specialized [*2]knowledge in their respective fields. Additionally, of course, the Court must consider the credentials of the expert, the experience that the expert has in the field, including specifically, and most importantly, experience involving identical or at least similar situations, similar circumstances, and similar issues as those which are presently before the Court (Ruggiero v Ruggiero, 143 AD3d 964; Saccone v Gross, 84 AD3d 1208).
While several witnesses who possessed relevant expertise testified at trial, the crux of the case revolves around the two competing restoration plans submitted by plaintiff's expert Laura Schwanof and defendants' expert Rusty Schmidt. Ms. Schwanof testified that she is a senior ecologist and based her opinions on, inter alia, her review of aerial photographs and video of the subject property, as well as site visits to the subject property, and also her observations from her visit to an adjacent Shinnecock Nation property. The parties do not dispute that most of the easement property was cleared of its trees (both canopy trees and sub-canopy trees) and had its understory cleared as well. The easement property's understory was comprised of various indigenous shrubs, bushes, and ground cover. Ms. Schwanof testified that in her opinion, based largely on her review of historical aerial photographs, defendants cut and removed 305 mature trees along with the understory. Her remediation plan called for the planting of 2,127 trees (319 white oaks, 1,026 scarlet oaks, 23 pine oaks, 730 red oaks, 23 black oaks, and 6 sassafras) at a cost of $4,338.38, and 76,388 shrubs (71,081 lowbush blueberry and black huckleberry, and 3,180 northern bayberry) at a cost of $681,939.38. In addition to these plantings, her remediation plan called for the removal of invasive species at a cost of $38,720.00. Additionally, her plan estimated the cost to supervise the restoration to be $59,290.00, and she also included a fee for "post-restoration monitoring" of $130,322.01 for five years. Thus, Ms. Schwanoff"s plan (after factoring in a multiplier that both she and Mr. Schmidt agreed was industry standard) came to a total of $2,217,885.16.
Mr. Schmidt's remediation plan called for the planting of 150 trees at a cost of $30,000.00, 1,000 shrubs at a cost 0f $75,000.00, 5,000 plugs at a cost of $20,000.00, supervision of the restoration project at a cost of $10,000.00, and five years of monitoring at a cost of $25,000.00. Thus, Mr. Schmidt's plan (again after applying the industry standard multiplier) came to a total of $351,612.50, including a built-in 15 percent factor for contingencies of $45,862.50.
The Court, having observed the testimony of these witnesses and after assessing the credibility of their testimony, as well as having considered all the factors mentioned heretofore as relevant to a court's determination when choosing between competing expert opinions, finds that the testimony of the defendant's expert Mr. Schmidt, and the basis for his testimony, is more persuasive, and that the defendants have established through that testimony, and the exhibits introduced into evidence, that their expert's proposed restoration plan is clearly more appropriate and warranted as the measure of damages in this case, to wit: the proper costs and actions required to restore the easement property to the condition that existed prior to the violations of the easement agreement (Ferreira v Wyckoff Hgts. Med. Ctr., 81 AD3d 587, 588; Segal v City of New York, 66 AD3d 865, 867).
The Court found numerous aspects of plaintiff's expert testimony and proposed plan troubling and unpersuasive including, inter alia, the fact that, as plaintiff's expert conceded [*3]herself, there was "a dearth of actual evidence of the condition of the easement property immediately preceding defendant's disturbance and violation" (the expert admitted that the historical aerial photos she reviewed did not provide a view of the understory), so she, in large part, used instead her surveillance and observations of the adjoining Shinnecock property, making the assumption that it was the same or similar to what was present on the easement property. The only apparent basis for this assumption was its proximity to the easement property. The Court finds this to be speculative and, indeed, was refuted by the defendant's expert, who testified that the properties were not similar. Specifically, defendants' expert pointed out that based on his observations of the Shinnecock property, the denseness of understory plantings was only found sporadically in portions of the property and not throughout the property, and yet plaintiff's expert recommended a plantings density for restoration of the easement property that contemplated that density running throughout the entirety of the easement property. 
In addition to the wholly speculative Shinnecock property comparison as her basis for recommending such dense plantings, plaintiff's expert offered an alternative rationale that less dense plantings, as proposed by the defendants' expert, would not provide protection against destruction by deer and rabbits. Plaintiff's expert failed to explain why this would be so, leaving the Court to speculate and wonder how her plan would provide added protection other than giving the deer and rabbits more to eat. The premise itself that a restoration plan should include such a drastic and costly recommendation to protect against deer and rabbits is itself questionable, and, in fact, was rejected by defendants' expert, who testified that we should "let deer be deer" and a restoration plan should not include costly protections not afforded by nature itself. Indeed, the plaintiff's expert's proposed number of plantings was so large that a defense witness who worked for a local landscaping company and was responsible for ordering plants for big landscape architects in the area testified that when she was asked to "source" - that is, find a supplier(s) for the number of plants called for by plaintiff's expert's plan - she could not find a supplier who could supply that many plants, even after asking her biggest wholesaler if they could provide them. This witness testified that in her entire career, she had never personally done such large numbers and had never heard of such a large number of proposed plantings on a project. Ironically, according to the defendants' expert, the larger number of plantings proposed by the plaintiff's expert would be counterproductive because it would engender a much higher failure rate of the plantings. Instead, groupings of smaller numbers of plantings would be far more effective with a higher survival rate. Essentially, defendants' expert testified that for the restoration plan for this property ideally less is more.
In addition to differing on the number of plantings needed, the experts also battled about the types of plantings that should be used. The defendants' expert recommended a more diverse variety of shrubs (nine more species than plaintiff's plan, along with 33 species of perennials that were not recommended at all by the plaintiff's expert), all of which would normally be found in a pitch pine forest, and, significantly, were types that would fare better in a sunnier environment. The defendants' expert testified that the plaintiff's plan failed to account for the fact that with the trees now gone, the understory plantings should thrive in a sunny environment. Nonetheless, the defense expert testified that the blueberry and huckleberry plantings recommended by plaintiff's expert do not fare well in a sunny environment and, in fact, he personally knew of a nearby [*4]restoration project with similar conditions to the easement property where only 10 percent of the huckleberry and blueberry plantings survived due to too much sunlight. The defense expert testified that he has seen these shrubs not surviving bright sunshine on at least seven other projects in the area. In contrast, he testified that in other projects he has worked on, he has achieved a very high 85 percent plantings success rate utilizing the type of restoration plan he proposed for this easement property. Furthermore, he testified that there would be no difference in the time it would take to restore the easement property to its prior condition utilizing his plan versus the plaintiff's expert's plan. In other words, the plaintiff's plan, although far more costly, would not achieve the goal of restoring the easement property to its prior condition any more quickly than his plan. Thus, critically, defendants' expert cited his 30 years of experience and gave concrete examples over those years of actual projects in the area that he personally worked on as support for the use of his proposed restoration plan as superior to the plan proposed by the plaintiffs. 
The Court must also note that in choosing between these competing experts' opinions, the defense expert found errors in the plaintiff's expert's plan with regard to plant spacing and in her cost calculations, and many of these errors were not insignificant or minor, but rather substantial in scope, resulting in large monetary discrepancies in her cost estimates. Plaintiff's expert, to her credit, admitted to the errors. Along the same lines, the Court notes that during her testimony, the plaintiff's expert used words, terms, and phrases in connection with her cost estimates that raised concerns for the Court, namely, as examples, words like it "might cost more", or it "may be more extensive." While courts and the law do not require absolute certainty in expert opinions, such precatory language does undermine the evidentiary support for requested damages (Cioffi-Petrakis v Petrakis, 103 AD3d 766; Bank of New York v Spadafora, 92 AD3d 629). 
There were other problematic elements of plaintiff's expert's testimony and restoration plan including, inter alia, the fact that she estimated the cost to remove invasive species from the easement property, but the defendants had already hired contractors who successfully accomplished the removals at a fraction of the cost estimated by plaintiff's expert. The plaintiff's expert testified that there were loblolly trees on the easement property, but the defense expert testified that he could find no loblolly trees on the property, and he provided persuasive photographic evidence to support his assertion. At one point in her testimony, plaintiff's expert blamed the defendants for the presence of invasive species on the property, but in the same sentence she acknowledged that this was an island-wide problem that "had been invading quite a bit of the east coast." Additionally, as noted by the defense expert, there was persuasive evidence that a self-healing process had begun on the easement property since the cutting took place in 2015, with the flora on the property regenerating itself and healthy trees and shrubs currently growing there, but it appears plaintiff's expert's opinion did not fully or appropriately account for this in her recommended restoration plan. As an example, the defense expert personally counted 166 pitch pine trees and 121 individual native bayberry bushes on the easement property. On the opposite side of this equation, the defense expert reviewed historical aerial photos of the easement property that showed evergreen trees that were dead or dying before they were removed, which the plaintiff's expert opinion did not account for in her recommended restoration plan. Lastly, and significantly, the defense expert referenced specific [*5]successful restoration projects he recently directed in the area over the last five or six years, utilizing the same methodologies he is recommending for the subject restoration.
For all the reasons set forth heretofore, the Court finds that the defendants' expert's proposed plan is the one that should be utilized as supervised by Mr. Schmidt and his firm Nelson, Pope, and Voorhis, with all costs therof to be borne and paid by the defendants (Ruggiero v Ruggiero, supra; Golding v Gottesman, 41 AD3d 430; D'Argenio v Ashland, 78 AD3d 758; Reitzel v Hale, 128 AD3d 1045).
The plaintiff's request for judgment on the fifth and sixth counts in its amended complaint for fraudulent conveyance of the easement property without notice to the plaintiff is moot given defendants' representation that they have consented to the transfer of ownership of the property back to The Maximillian Salvatore 2010 Living Trust and The Diana Salvatore 2010 Living Trust, the transferors in the claimed inappropriate transaction. The settled judgment shall include a directive to effect such transfer, assuming it has not already been done. 
Finally, the plaintiff's request for attorney's fees and expenses in the amount of $490,913.71. is granted. The subject easement agreement provides for the defendants' payment of plaintiff's attorney's fees. The defendants waived any objection to the reasonableness of the plaintiff's attorney's fees and raised only a single argument that because the plaintiff was advanced the attorney fees by a third party, which must be repaid, this somehow obviated the defendants' obligation under the easement agreement to pay the plaintiff's legal fees. This argument is frivolous, and the defendants have not provided a single case or statute to support this argument. Accordingly, it is rejected.
Settle judgment on notice.
Dated: August 22, 2025
Hon. Joseph C. Pastoressa, J.S.C.